IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOHN RAY COLLINS, JR. and<br>TAMBARA LORENE COLLINS,<br><br>Defendants. | Case No. 23-CR-114-JFH |

## OPINION AND ORDER

Before the Court are several motions filed by Defendant John Ray Collins, Jr. ("J. Collins") regarding the joint trial he is currently scheduled to have with his co-defendant Tambara Lorene Collins ("T. Collins"). J. Collins requests severance from T. Collins [Dkt. No. 77], disclosure of co-conspirator information and exclusion of statements under *Bruton v. United States*, 391 U.S. 123 (1968) [Dkt. No. 115], and an order preventing T. Collins from testifying against him or about their purported marriage [Dkt. No. 87]. T. Collins moves to join the severance motion. Dkt. No. 80. For the reasons stated, T. Collins' motion to join the severance motion is GRANTED and J. Collins' motions are DENIED.

## BACKGROUND

J.M. and R.M. are brothers, six and four years old respectively. Dkt. No. 113 at 2. J. Collins is their stepfather and T. Collins is their biological mother. *Id.* J. Collins and T. Collins share a last name and an infant child, and they hold themselves out to be a married couple.[1] *Id.*

Between January and June 2023, J. Collins and T. Collins allegedly severely physically abused J.M. and R.M. Dkt. No. 43. Specifically, J. Collins is charged with attempting to murder

---

[1] No proof of a legal marriage has been presented to the Court. *See infra* Section III.

J.M. by striking him on the head with a metal pipe; abusing J.M. by striking, kicking, twisting his arms and hands, and lashing him with an object; abusing R.M. by striking him; and neglecting J.M. by willfully and maliciously failing to provide him with adequate nurturance and affection, food, clothing, shelter, sanitation, hygiene, medical care, and supervision, by failing to obtain medical care, failing to provide food or water, failing to provide adequate nurturance and affection, and failing to provide sanitary living conditions to him. *Id.* T. Collins is charged with abusing J.M. by striking and lashing him with a belt and failing to protect him; abusing R.M. by striking him and failing to protect him; and neglecting J.M. by willfully and maliciously failing to provide him with adequate nurturance and affection, food, clothing, shelter, sanitation, hygiene, medical care, and supervision, by failing to obtain medical care, failing to provide food or water, failing to provide adequate nurturance and affection, and failing to provide sanitary living conditions to him. *Id.* J. Collins is charged as a non-Indian under 18 U.S.C. § 1152 and T. Collins is charged as an Indian under 18 U.S.C. § 1153.

The Government's briefing provides alleged details of the underlying facts. Dkt. No. 108; Dkt. No. 110; Dkt. No. 113; Dkt. No. 119.[2] It describes "a concerned citizen" who had attempted to visit Defendants' residence at 1315 S. Oklahoma Ave., Okmulgee, Oklahoma (the "1315 address") but had "been denied entry" by T. Collins. Dkt. No. 113 at 1. On June 12, 2023, this individual learned that Defendants were out of the house to take their infant to the hospital for a fever, and she entered the 1315 address because she had "developed fears for the children who lived within that household." *Id.* She found four-year-old R.M. and six-year-old J.M. home alone; R.M. had a large, circular bruise under one eye, while J.M. was "laying on [a] blanket, soaked in his own blood, on the floor of [a] bedroom." *Id.* at 2. When she asked J.M. if he was okay, he

---

[2] The factual statements in these briefs appear largely identical.

said he was not and that his mom and dad hit him a lot. *Id.* The individual left the residence and called the Okmulgee County Sheriff's Office ("OCSO").

J. Collins and T. Collins apparently arrived at their residence between the time the individual left and OCSO arrived. The Government describes OCSO body camera footage where T. Collins "showed hesitation" interacting with the officer, "insisted" to him that "our children are fine," eventually retrieved R.M. from inside the house after repeated request by the officer, is heard telling R.M. to "remember what I told you about all that lying," and is heard telling the deputy "we've been having lying problems." *Id.* at 2. The body camera footage also apparently shows J. Collins holding J.M. by the arm. According to the Government, J.M. had numerous apparent injuries and was in visible pain, and deputies reported that both R.M. and J.M. "smelled like stale urine and filth." *Id.* J.M. purportedly told OCSO at various times that "my mom and dad beat me up" and "I've been locked up in a room." *Id.* at 3.

Both brothers allegedly received medical treatment and were later forensically interviewed. J.M. was taken to the Okmulgee Hospital and then life-flighted to St. Francis Hospital in Tulsa where he was hospitalized for a week, from June 13 to June 21, 2023, with a lacerated liver, kidney failure, and numerous other injuries. *Id.* During his forensic interview, J.M. told the interviewer that his parents "stompted" and "whooped" him; blockaded his door with two heavy totes so he could not get out to use the bathroom, get food or water, or brush his teeth; and did not clean the Paw Patrol potty in his room, which caused it to get "stinkier and stinkier." *Id.* J.M. also described his "dad" hitting him on the head with a big metal pipe that made some noises. *Id.* R.M. was taken to the Okmulgee Hospital and treated for extensive bruising and lacerations. During his forensic interview, he told the interviewer that his parents "beat [him] up" with their fists and

hands. *Id.* Each brother also described abuse inflicted on the other: J.M. said that the "whooping" happened to R.M. as well, and R.M. said that when his mom got mad, she "beats J.M. up." *Id.*

This federal case began by criminal complaint against T. Collins on June 15, 2023. Dkt. No. 1. The initial indictment, filed on July 12, 2023, also named only T. Collins as a defendant. Dkt. No. 20. J. Collins was added as a defendant in the superseding (and currently operative) indictment filed on August 9, 2023. Dkt. No. 43. A joint jury trial is set for November 6, 2023. Dkt. No. 41; Dkt. No. 65.

## AUTHORITY AND ANALYSIS

### I. Motion to Sever [Dkt. No. 77; Dkt. No. 80]

J. Collins requests severance from T. Collins, and T. Collins moves to join in his request. Dkt. No. 77; Dkt. No. 80. The Court grants T. Collins' requested joinder. According to J. Collins, "[T. Collins] immediately blamed [him] for the accusations contained in the superseding indictment, and [this] would be her strategy at trial." Dkt. No. 77 at 1. T. Collins provides no independent argument in her joinder. Dkt. No. 80.

The Federal Rules of Criminal Procedure allow an indictment to "charge [two (2)] or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). "As a general rule, persons indicted together are tried jointly." *United States v. Martinez*, 76 F.3d 1145, 1152 (10th Cir. 1996). Joint trials of defendants who are indicted together are preferable because '[t]hey promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *United States v. Hall*, 473 F.3d 1295, 1301-02 (10th Cir. 2007) (quoting *Zafiro v. United States*, 506 U.S. 534, 537 (1993)). However, Federal Rule of Criminal Procedure 14 allows "relief from prejudicial joinder" and states, "If the joinder of offenses or defendants in

an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a).

Severance is a matter of discretion, not of right. *United States v. McConnell*, 749 F.2d 1441, 1444 (10th Cir. 1984). "[B]ecause severance is a matter of discretion, a defendant bears the heavy burden of showing real prejudice." *United States v. Wardell*, 591 F.3d 1279, 1299 (10th Cir. 2009) (internal quotations omitted). Phrased differently, "[a] defendant must show actual or threatened deprivation of his right to a fair trial." *Martinez*, 76 F.3d at 1152.

The Tenth Circuit has set out a three-step inquiry for district courts to conduct. *United States v. Pursley*, 474 F.3d 757, 765 (10th Cir. 2007). First, the Court must "determine whether the defenses presented are so antagonistic that they are mutually exclusive;" second, "because mutually antagonistic defenses are not prejudicial per se, a defendant must further show a serious risk that a joint trial would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence;" and finally, only if the first two factors are met, the Court "exercises its discretion and weighs the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration." *Id.* (internal quotations and citations omitted).

A. Antagonistic defenses

"Defenses are mutually antagonistic if 'the conflict between codefendants' defenses is such that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other." *Pursley*, 474 F.3d at 765 (quoting *United States v. Linn*, 31 F.3d 987, 992 (10th Cir. 1994)). "In other words, defendants must show that 'the acceptance of one party's defense would

tend to preclude the acquittal of the other, or that the guilt of one defendant tends to establish the innocence of the other.'" *Id.* (quoting *United States v. Peveto*, 881 F.2d 844, 857 (10th Cir. 1989)).

Neither Defendant explains how the two anticipated trial strategies are mutually exclusive. T. Collins provides no independent argument, while J. Collins provides only conclusory statements that his "own defense will be both antagonistic and conflicting to his co-defendant . . . as [hers] will be antagonistic and conflicting to his," and that he "will be substantially prejudiced at jury trial if forced to defend himself while sitting beside hostile co-defendant who has provided statements to the Government and may otherwise implicate him by simply sitting at the same table during jury trial." Dkt. No. 77 at 2.[3] Yet, jurors could reasonably believe one defendant's claim that the other defendant is guilty without necessarily believing the first of the two to be innocent.

"[T]he mere fact that codefendants accuse each other of the crime – a situation that is not uncommon – does not, in and of itself, require severance." *United States v. Rose*, No. 21-CR-294-RAW, 2022 WL 1085602, at *2 (E.D. Okla. Apr. 11, 2022) (quotation omitted). In a recent similar case in this district, the Hon. Ronald A. White reasoned that "[a] jury could rationally find one, both, or neither defendant guilty" of "various manifestations of child abuse and child neglect, as well as aiding and abetting," that were charged against a male and a female defendant. *Id.* Judge White then denied the defendants' joint severance motion at the first *Pursley* prong. The Court has grounds to do so here as well.

---

[3] The severance motion filed by J. Collins—full name John Ray Collins—additionally includes an incoherent sentence that "It is known that co-defendant **JOHN RAY COLLINS** have [sic] made admissions which might tend to incriminate himself [sic]." Dkt. No. 77 at 3. This sentence could be read several ways: J. Collins' co-defendant Tambara Collins may have made admissions which tend to incriminate *herself*; T. Collins may have made admissions which tend to incriminate *him*; or T. Collins may be aware of admissions made by J. Collins which tend to incriminate *himself*. Without a clearer record, the Court does not consider this as a basis for severance.

### B. Specific right

Even had the Court been persuaded that mutually antagonistic defenses exist here, Defendants would not be entitled to severance. The Supreme Court has recognized a risk of prejudice may occur in a joint trial and that that risk may be heightened when defendants have "markedly different degrees of culpability." *Wardell*, 591 F.3d at 1300 (citing *Zafiro*, 506 U.S. at 539). "Nonetheless, the nearly insuperable rule in this circuit is that 'a defendant cannot obtain severance simply by showing that the evidence against a co-defendant is more damaging than the evidence against herself.'" *Id.* (quoting *United States v. Dazey*, 403 F.3d 1147, 1165 (10th Cir. 2005)).[4]

J. Collins includes a single sentence in his motion that "there is a real threat that [he] will be deprived of a fair trial due to the evidence concerning [sic] 'spilling over' to him." Dkt. No. 77 at 4. But "[a]s general rule, neither a mere allegation that defendant would have a better chance of acquittal in a separate trial" nor an argument that evidence against one defendant would have a 'spillover effect' on another defendant demonstrates prejudice." *United States v. Jones*, 530 F.3d 1292, 1303 (10th Cir. 2008). The charges against both Defendants stem from the same general nucleus of facts and the Government is likely to prove each charge against each Defendant through interrelated evidence. *See Wardell*, 591 F.3d at 1301.

---

[4] While the superseding indictment does not charge a conspiracy, J. Collins alleges throughout several of his motions that the Government's prosecutorial theory involves an alleged uncharged conspiracy between J. Collins and T. Collins. This would not change the analytical framework. "[A] mere disparity in the evidence from a quantitative standpoint against each defendant in a conspiracy case, without more, provides no justification for severance." *United States v. Hack*, 782 F.2d 862, 871 (10th Cir. 1986). Only in "an extraordinary instance" will "prejudice [be] manifested from evidentiary and culpability disparities" between charged co-conspirators. *Wardell*, 591 F.3d at 1300. Even if there is a high risk of prejudice, "less drastic measures, such as limiting instructions, often will suffice to cure [it]." *Zafiro*, 506 U.S. at 539.

Both the Supreme Court and the Tenth Circuit "teach[] that juries may properly be relied on to differentiate among defendants and among charges." *United States v. Emmons*, 24 F.3d 1210, 1219 (10th Cir. 1994). If requested, the Court will take steps to minimize any spillover prejudice, such as instructing the jury "to give separate and individual consideration to each charge against each defendant." *Wardell*, 591 F.3d at 1301 (citing *Hack*, 782 F.2d at 871). J. Collins has not demonstrated any evidentiary or culpability disparity so extreme as to justify severance, nor any other infringement of a specific trial right.[5]

**C. Judicial economy**

Because Defendants have not met either of the first two criteria for justifying severance, the Court need not weigh any prejudice to them of a joint trial against judicial economy. Nevertheless, the undersigned believes it appropriate to make a clear record that the inefficiency of separate trials would be markedly strong in this case and this district.

The Northern and Eastern Districts of Oklahoma have experienced unprecedented caseloads and jurisdictional complexities since the Supreme Court's decision in *McGirt v. Oklahoma*, 140 S.Ct. 2452 (2020). As Chief Justice Roberts recognized in his *McGirt* dissent, "the share of serious crimes committed by 10%–15% of the 1.8 million people in eastern

---

[5] J. Collins briefly expressed concern in his severance motion about his Sixth Amendment confrontation rights if jointly tried with T. Collins, an argument he raised marginally more fully in a separate motion. Dkt. No. 77 at 5; Dkt. No. 115. The Court incorporates its discussion of the other motion *infra* Section II.B. here. The Court further notes that, even if it had identified any confrontation issues, Defendants would not automatically be entitled to separate trials. *United States v. Hill*, 901 F.2d 880, 883 (10th Cir. 1990). The Supreme Court recently explained this would be "too high a price to pay" given the fact that "joint trials have long played a vital role in the criminal justice system, preserving government resources, allowing victims to avoid reliving trauma, encouraging consistent verdicts, and enabling more accurate assessments of relative culpability." *Samia v. United States*, 599 U.S. 635, 654 (2023) (cleaned up); *see also id.* (noting separate trials "randomly favor the last-tried defendants who have the advantage of knowing the prosecution's case beforehand").

Oklahoma, or of the 400,000 people in Tulsa, is no small number." 140 S.Ct. at 2501. The dramatic increase in criminal caseloads because of *McGirt* has resulted in strained judicial resources across numerous areas.

The practical effect of *McGirt* was an immediate increase of nearly 200% in the number of criminal cases filed in the Northern District and more than 400% in the Eastern District. *See* U.S. Courts, *Judiciary Supplements Judgeship Request, Prioritizes Courthouse Projects* (Sept. 28, 2021), https://www.uscourts.gov/news/2021/09/28/judiciary-supplements-judgeship-request-prioritizes-courthouse-projects. This extraordinary number of criminal cases thrust into federal court, virtually overnight, is unlike anything ever seen in this Country's history. Indeed, the Supreme Court has since recognized the "significant challenge for the Federal Government and for the people of Oklahoma" in the wake of *McGirt*. *Oklahoma v. Castro-Huerta*, 142 S.Ct. 2486, 2492 (2022). Numerous federal courts have "noted *McGirt*'s tremendous impact." *United States v. Budder*, 601 F. Supp. 3d 1105, 1114 (E.D. Okla. 2022) (collecting cases), *aff'd* 76 F.4th 1007 (10th Cir. 2023) ("To be sure, *McGirt* changed long-standing practice of the criminal-justice system in Oklahoma.").

The Eastern District of Oklahoma has one and a half district judges, of which the undersigned is the half-time judge due to his multi-district caseload. Amid this unprecedented strain on judicial resources, the Court grants severances in only the most compelling circumstances. *See United States v. Barker*, No. 21-CR-175-JFH, Dkt. No. 65 at 5 (E.D. Okla. Mar. 23, 2022) (noting the Court's strong disfavor of severances given its post-*McGirt* caseload but granting motion to sever where constitutional *Bruton* issue was inescapable). Defendants have not demonstrated such circumstances.

II.  Motion regarding Co-Conspirator Statements and *Bruton* [Dkt. No. 115]

A.  Co-conspirator statements

J. Collins[6] requests the Court "order the Government to identify and produce [] alleged co-defendant ('co-conspirator') statements before they are offered for admission." Dkt. No. 115 at 3. He claims he needs the Court to order this so he may "effectively investigate and be prepared to rebut such statements" and obtain a ruling from the Court about their admissibility "before the tainting of the jury by exposure to inadmissible evidence occurs." *Id.* This raises two issues: discovery and admissibility.

The first issue appears moot. The parties' joint status report on the status of discovery states that defense counsel has been provided flash drives containing all available discovery in the case. Dkt. No. 74. J. Collins does not identify any discovery or statements that he has been unsuccessful in attempting to obtain without the Court's intervention. Dkt. No. 115 at 3.[7] The Government states that all statements made by each Defendant in this case have been provided to both Defendants and their counsel. Dkt. No. 130 at 2.

The second issue is premature. The Government "argues that the Court would be best situated to rule on the admissibility of any statements under Rule 801(d)(2)(E) after the [Government] moves for the admission of any such statements in trial." Dkt. No. 130 at 3. The Court agrees. Pretrial proffer of anticipated co-conspirator statements pursuant to Rule 801(d)(2)(E) is generally seen in complex multidefendant cases where mid-trial assessments would

---

[6] T. Collins moved to join J. Collins' original co-conspirator/*Bruton* motion. Dkt. No. 80. The Court denied without prejudice the original underlying motion and T. Collins' joinder in it [Dkt. No. 92]. After J. Collins refiled the co-conspirator/*Bruton* motion [Dkt. No. 101 (granting leave to refile); Dkt. No. 115], T. Collins did not file a new request for joinder.

[7] The Court notes LCrR 16.1 states "the necessity of filing discovery motions is eliminated except when disputes arise." J. Collins has not identified a dispute.

be unduly time-consuming. *See, e.g.*, *United States v. Banschbach, et al.*, 22-CR-162-JFH, Dkt. No. 113 (E.D. Okla. Dec. 13, 2022) (ordering pretrial proffer of co-conspirator statements in drug conspiracy case that had been declared complex based on the presence of five defendants, ten counts, and gigabytes of digital discovery); *id.* at Dkt. No. 137 (Government proffer involving 72 pages of text messages and phone calls). The facts and circumstances of this case are quite different from the *Banschbach* co-conspirator briefing. The Court is not concerned that judicial economy would be unduly taxed by addressing the co-conspirator rule during trial here, as no voluminous digital communication-related discovery has been described. At trial, before the Government attempts to introduce any statements through Rule 801(d)(2)(E), it shall raise the issue with the Court outside the jury's presence.

### B. *Bruton*

"Prosecutors have long tried criminal defendants jointly in cases where the defendants are alleged to have engaged in a common criminal scheme." *Samia*, 599 U.S. at 639. "However, when prosecutors seek to introduce a nontestifying defendant's confession implicating his codefendants, a constitutional concern may arise." *Id.* In *Bruton*, the Supreme Court held that "it would violate the Confrontation Clause to allow the confession of a non-testifying co-defendant that implicated the defendant to be used against that defendant at their joint trial." *United States v. Clark*, 717 F.3d 790, 814 (10th Cir. 2013) (quotation and citation omitted).

*Bruton* is a narrow exception. *Samia*, 599 U.S. at 647. Following the Supreme Court's ruling in *Crawford v. Washington*, 541 U.S. 36 (2004), it applies only to statements that are testimonial in nature. *Clark*, 717 F.3d at 816 (instructing district courts to "view *Bruton* through the lens of *Crawford*" and consider "whether the challenged statement is testimonial"). It concerns only "powerfully incriminating extrajudicial statements of a codefendant," *Bruton*, 391 U.S. at

135, and through later Supreme Court decisions, its application has been limited to "those few contexts where the statement is so inculpatory as to the defendant that the practical and human limitations of the jury system cannot be ignored," *Clark*, 717 F.3d at 814 (quotation and citation omitted).

Statements that "incriminate inferentially" do not present *Bruton* problems. *Gray v. Maryland*, 523 U.S. 185, 195 (1998) (citing *Richardson v. Marsh*, 481 U.S. 200, 208, 211 (1987) (declining to extend *Bruton* to confession that do not name the nontestifying defendant)). "Only where [an] inculpatory inference can be made immediately in the mind of a reasonable juror," the statement is protected by *Bruton*. *United States v. Rahseparian*, 231 F.3d 1267, 1278 (10th Cir. 2000). If a "confession has been modified to avoid directly identifying the nonconfessing codefendant and [] the court offers a limiting instruction that jurors may consider the confession only with respect to the confessing codefendant," the Confrontation Clause is not implicated and *Bruton* does not apply. *Samia*, 599 U.S. at 640.

*Bruton* challenges should be brought about specific evidence. *See Barker*, No. 21-CR-175-JFH, Dkt. No. 65 at 5 (examining three jail notes); *United States v. Morgan*, 748 F.3d 1024, 1038 (10th Cir. 2014) (reviewing one specific recorded phone call); *United States v. Patterson*, 713 F.3d 1237, 1246-47 (10th Cir. 2013) (reviewing two specific statements). After all, "[f]or *Bruton* to apply, a codefendant's statement must be clearly inculpatory standing alone.'" *United States v. Villota-Gomez*, 994 F. Supp. 1322, 1338 (D. Kan. 1998) (quotation and citation omitted) (rejecting *Bruton* challenge where "defendants assert[ed] without elaboration that a *Bruton* problem exist[ed]" without identifying or challenging specific statements).

J. Collins "contends that *any* co-defendant statements in this case squarely fall[] within the scope of *Bruton*." Dkt. No. 115 at 6 (emphasis added). He claims this is so because "they are

12

directly inculpatory against Mr. Collins who cannot subpoena them [sic] to testify and to expound on his actual non-involvement." *Id.* He further argues that redaction would not be effective because reference to him would still be obvious. *Id.* at 7. But the Court cannot evaluate *Bruton* challenges in a vacuum. *See Villota-Gomez*, 994 F. Supp. at 1338. J. Collins submitted one specific statement allegedly by T. Collins as an exhibit to his combined reply brief. Dkt. No. 132-1. Therefore, the Court reviews that statement—and that statement only—for potential *Bruton* issues.[8]

The statement J. Collins submitted is a color scan of a letter handwritten—presumably by T. Collins—on a yellow legal pad. It reads:

> Hi my golden Bubba, I love you so much. I am so proud of You! Stay strong! Mommy wants you to know that I love you across the earth + to the moon and back. Mommy is very very sorry For what John done to you. Mommy is very sorry I did a bad job protecting you because I did not know how bad John was. This should never had happened to you. Mommy is forever sorry to you. I Love you! I will forever be yours  Honey I did not know John was hurting you that bad. I am so so sorry. John is gone gone. Mommy tell the truth about John being mean to you & R[]. Mommy will do everything I can to get all 3 of you back with me only. I promise. I want to be with you. I will be there as soon as they say I can. I would lay in your bed + snuggle you up. I am very sorry John hurt you like this. I am sorry I did not see through John's lies. No more John EVER. You never have to see him again. It will only be us 4 from now on.
>
> I LOVE You with every hot wheels cars ever made. I will bring you all a gift. See you very soon. I love you all so very much.
>
> Love Mommy

Dkt. No. 132-1 at 3.

It is unclear whether the statement is testimonial for Sixth Amendment purposes. The Tenth Circuit has "posited two possible definitions of a 'testimonial' statement." *Clark*, 717 F.3d

---

[8]  The Court does not consider any authentication, hearsay, or other potential evidentiary issues regarding the exhibit and does not rule on its admissibility in general.

at 816. First, a testimonial statement may be "a formal declaration made by the declarant that, when objectively considered, indicates the primary purpose for which the declaration was made was that of establishing or proving some fact potentially relevant to a criminal prosecution." *Id.* (quoting *United States v. Smalls*, 605 F.3d 765, 778 (10th Cir. 2010)). Alternatively, it may be "a formal statement such that a reasonable person in the position of the declarant would objectively foresee that the primary purpose of the statement was for use in the investigation or prosecution of a crime." *Id.* (quoting *Smalls*, 605 F.3d at 778). Where a statement is not primarily "made to be used for investigation or prosecution of a crime," it is not testimonial for Sixth Amendment purposes. *United States v. Morgan*, 748 F.3d 1024, 1038 (10th Cir. 2014) (citation and quotation marks omitted). *See also United States v. Solorio*, 669 F.3d 943, 953 (9th Cir. 2012) ("[S]tatements made out-of-court with a primary purpose other than possible prosecutorial use are nontestimonial.") (quoted with approval in *Clark*, 717 F.3d at 816).

Here, the facts surrounding the writing of the letter are unclear such that the Court cannot make an objective assessment of the statement's primary purpose, and therefore, whether it is testimonial. The exhibit includes a Miranda waiver signed by T. Collins on June 13, 2023, but the handwritten letter is not dated, and no factual allegations are set out in J. Collins' brief about whether the letter was written contemporaneously with execution of the waiver. Dkt. No. 132-1; Dkt. No. 132 at 1 n.1. While the letter discusses past events relevant to this later criminal prosecution, it is not clear to the Court whether the letter was an intercepted communication from T. Collins to her child or a statement by T. Collins made to law enforcement about what she would tell her child if she could.[9] Even if construed to be testimonial, however, the letter would still not cause a *Bruton* problem.

---

[9] The presence of multiple hand-drawn hearts on the letter suggests the former.

The letter does incriminate J. Collins, true. However, the Court is confident that it could be redacted in such a way that it would satisfy *Bruton* and its progeny. For instance, the letter could be redacted to read:

> 
> Hi my golden Bubba, I love you so much. I am so proud of You! Stay strong! Mommy wants you to know that I love you across the earth + to the moon and back. Mommy is very very sorry ███████████████ Mommy is very sorry I did a bad job protecting you ████████████████████ This should never had happened to you. Mommy is forever sorry to you. I Love you! I will forever be yours ███████████████████████████ Mommy will do everything I can to get all 3 of you back with me only. I promise. I want to be with you. I will be there as soon as they say I can. I would lay in your bed + snuggle you up. ██████████████████████ ███ It will only be us 4 from now on.

These redactions would not be so obvious as to immediately call J. Collins to mind, nor would redacting the letter eviscerate its evidentiary value.

The letter discusses T. Collins' and J. Collins' alleged culpability in overlapping, but not inextricably intertwined, ways. Earlier this year, the Supreme Court reaffirmed that its "precedents distinguish between confessions that directly implicate a defendant and those that do so indirectly." *Samia*, 599 U.S. at 652. Only directly accusatory incriminating testimonial statements fall within *Bruton*'s narrow application. *Id.* at 652-63. Since the letter—if construed to be testimonial—could be redacted to "not refer directly" to J. Collins and instead "become incriminating [to him] only when linked with evidence introduced later at trial," *id.* at 653 (citation and quotation marks omitted), *Bruton* does not apply.

### III.    Motion in Limine regarding Spousal Privilege [Dkt. No. 87]

Spousal privilege is "intended to encourage marital confidences, which confidences in turn promote harmony between husband and wife." *United States v. Neal*, 743 F.2d 1441, 1447 (10th Cir. 1984) (Logan, J., concurring). "In order for [a] defendant to assert the privilege, there must

have been at the time of the communication in question a marriage recognized as valid under law." *United States v. Knox*, 124 F.3d 1360, 1365 (10th Cir. 1997).

J. Collins asserts he and T. Collins are husband and wife. Dkt. No. 87 at 2. However, it is well established that statements, arguments, and questions by lawyers are not evidence. *See United States v. Fleming*, 667 F.3d 1098, 1106 (10th Cir. 2011). J. Collins has provided no evidence or proof of a valid legal marriage. The Government is correct in its assertion that J. Collins' failure to demonstrate a legal marriage is sufficient basis to deny his spousal privilege motion. *See* Dkt. No. 110 at 6. Given the relative ease with which J. Collins could supplement the record with a marriage license or other proof of a legal marriage, however, the Court considers the substance of his spousal privilege motion in the interest of judicial economy.

Federal Rule of Evidence 501 and federal common law recognize two types of marital privilege: "the *testimonial privilege* which permits one spouse to decline to testify against the other during the marriage, and the marital *communications privilege* which either spouse may assert to prevent the other from testifying to confidential communications made during the marriage." *United States v. Bahe*, 128 F.3d 1440, 1441-42 (10th Cir. 1997) (emphasis in original). Neither applies.

The testimonial privilege may not be exerted by one spouse to prevent the other spouse from testifying. *Trammel*, 445 U.S. at 52. "[T]he witness-spouse alone has a privilege to refuse to testify adversely" and "may be neither compelled to testify nor foreclosed from testifying." *Id.* at 53. J. Collins may not foreclose T. Collins from testifying should she choose to. Likewise, the Government may not force T. Collins to testify should she choose not to. The choice whether or not to testify is squarely her prerogative.

The communications privilege belongs to both spouses, but it does not apply in this case. In general, communication between spouses about allegedly criminal behavior is privileged "if the sole knowledge and information and/or participation [by one spouse] involves a conversation wherein the spouse who committed the crime discloses that fact to the other spouse." *United States v. Neal*, 743 F.2d 1441, 1446 (10th Cir. 1984) (emphasis removed). If spouses conspire or participate in the commission of an alleged crime together, or if a "spouse who did not conspire to or participate in the commission of the crime nevertheless thereafter, with knowledge of the fact that the other spouse did commit the crime, actively, by overt acts, participates in the 'fruits' of the crime or 'covers up' evidence thereof by any means," the privilege does not apply. *Id.* Further, a public policy exception removes from the privilege any communications relating to the abuse of a minor child within a household. *Bahe*, 128 F.3d at 1442, 1446. The Tenth Circuit explained succinctly:

> Child abuse is a horrendous crime. It generally occurs in the home and is often covered up by the innocence of small children and by threats against disclosure. It would be unconscionable to permit a privilege grounded on promoting communications of trust and love between marriage partners to prevent a properly outraged spouse with knowledge from testifying against the perpetrator of such a crime.

*Id.* at 1446 (internal citation omitted). Here, both spouses are charged with child abuse and child neglect. Dkt. No. 43.[10] The marital communications privilege does not shield any communications between J. Collins and T. Collins related to the charged conduct.

---

[10] The rule announced in *Bahe* applies regardless of relationship between the adults and children involved as long as all were under the same roof at the time of the charged conduct. *See* 128 F.3d at 1446 ("We see no significant difference, as a policy matter, between a crime against a child of the married couple, against a stepchild living in the home, or . . . against an eleven-year-old relative visiting in the home."). Thus, the fact that the alleged victims are biological children of only one of the two Defendants is not material to the Court's determination.

## CONCLUSION

IT IS THEREFORE ORDERED that:

- T. Collins' motion to join J. Collins' motion to sever [Dkt. No. 80] is GRANTED.

- Defendants' motion to sever [Dkt. No. 77] is DENIED.

- J. Collins' motion regarding co-conspirator statements and *Bruton* [Dkt. No. 115] is DENIED. At trial, before the Government attempts to introduce any statements through Rule 801(d)(2)(E), it shall raise the issue with the Court outside the jury's presence.

- J. Collins' motion in limine regarding spousal privilege [Dkt. No. 87] is DENIED.

Dated this 11th day of October 2023.

_____
JOHN F. HEIL, III
UNITED STATES DISTRICT JUDGE